EXHIBIT B

# UBER TECHNOLOGIES, INC.
## 2013 EQUITY INCENTIVE PLAN
### NOTICE OF STOCK OPTION GRANT

Lenza McElrath

     You have been granted an option to purchase shares of Class A Common Stock of Uber Technologies, Inc., a Delaware corporation (the "Company"), under the Company's 2013 Equity Incentive Plan (the "Plan"), as follows (unless otherwise defined in this Notice of Stock Option Grant, the terms used in this Notice of Stock Option Grant shall have the meanings defined in the Plan):

| | |
|---|---|
| Date of Grant: | 10/14/2014 |
| Exercise Price Per Share: | $16.58 |
| Total Number of Shares: | 20,000 |
| Total Exercise Price: | $331,600.00 |
| Type of Option: | Incentive Stock Option |
| Expiration Date: | 10/13/2024 |
| Vesting Commencement Date: | 9/29/2014 |
| Vesting/Exercise Schedule: | This Option shall be exercisable in whole or in part, six months after the Date of Grant, provided, however, that the Company or its assignee shall have the option to repurchase any Unvested Shares (as defined below) on the terms and conditions set forth below in Section 6 of the Exercise Agreement attached hereto as Exhibit A (the "Exercise Agreement"). "Unvested Shares" are Shares in which Optionee is not vested at the time of his or her termination of employment or consulting relationship with the Company in accordance with the following Vesting Schedule and which are then still subject to the Company's Repurchase Option. "Vested Shares" are Shares which are no longer subject to the Company's Repurchase Option (as defined in the Exercise Agreement). So long as your Continuous Service Status does not terminate, the Shares underlying this Option shall vest in accordance with the following schedule: 12/48ths of the Total Number of Shares shall vest on the one year anniversary of the Vesting Commencement Date and 1/48th of the Total Number of Shares shall vest on each monthly |

UBER_000132

| | anniversary of the Vesting Commencement Date thereafter. |
|---|---|
| Termination Period: | You may exercise this Option for thirty (30) days after termination of your Continuous Service Status except as set out in Section 5 of the Stock Option Agreement (but in no event later than the Expiration Date).  You are responsible for keeping track of these exercise periods following the termination of your Continuous Service Status for any reason.  The Company will not provide further notice of such periods. |
| Transferability: | You may not transfer this Option. |

By your signature and the signature of the Company's representative below, you and the Company agree that this Option is granted under and governed by the terms and conditions of the Plan and the Stock Option Agreement, both of which are attached to and made a part of this document.

In addition, you agree and acknowledge that your rights to any Shares underlying this Option will be earned only as you provide services to the Company over time, that the grant of this Option is not as consideration for services you rendered to the Company prior to your date of hire, and that nothing in this Notice or the attached documents confers upon you any right to continue your employment or consulting relationship with the Company for any period of time, nor does it interfere in any way with your right or the Company's right to terminate that relationship at any time, for any reason, with or without cause.  You agree and acknowledge that the Vesting/Exercise Schedule may change prospectively in the event that Optionee's service status changes between full and part time status in accordance with Company policies relating to work schedules and vesting of equity awards.  Also, to the extent applicable, the Exercise Price Per Share has been set in good faith compliance with the applicable guidance issued by the Internal Revenue Service (the "IRS") under Section 409A of the Code.  However, there is no guarantee that the IRS will agree with the valuation, and by signing below, you agree and acknowledge that the Company shall not be held liable for any applicable costs, taxes, or penalties associated with this Option if, in fact, the IRS were to determine that this Option constitutes deferred compensation under Section 409A of the Code.  You should consult with your own tax advisor concerning the tax consequences of such a determination by the IRS.

*[Signature Page Follows]*

CONFIDENTIAL                                                                                    UBER_000133

The parties have executed this Notice of Stock Option Grant as of the date first set forth above.

**THE COMPANY:**

**UBER TECHNOLOGIES, INC.**

By: _____
         (signature)

Name:  Travis Kalanick
Title:    CEO


**OPTIONEE:**

**Lenza McElrath**

*Lenza H. McElrath III*
_____
(signature)

Address:

_____

_____

3

                                                              UBER_000134

## UBER TECHNOLOGIES, INC.

## 2013 EQUITY INCENTIVE PLAN

## <u>STOCK OPTION AGREEMENT</u>

1.     **Grant of Option.**   Uber Technologies, Inc., a Delaware corporation (the "<u>Company</u>"), hereby grants to Lenza McElrath ("<u>Optionee</u>"), an option (the "<u>Option</u>") to purchase the total number of shares of Class A Common Stock (the "<u>Shares</u>") set forth in the Notice of Stock Option Grant (the "<u>Notice</u>"), at the exercise price per Share set forth in the Notice (the "<u>Exercise Price</u>") subject to the terms, definitions and provisions of the Uber Technologies, Inc. 2013 Equity Incentive Plan (the "<u>Plan</u>"), adopted by the Company, which is incorporated in this Agreement by reference. Unless otherwise defined in this Agreement, the terms used in this Agreement shall have the meanings defined in the Plan.

2.     **Designation of Option.**   This Option is intended to be an Incentive Stock Option as defined in Section 422 of the Code only to the extent so designated in the Notice, and to the extent it is not so designated or to the extent this Option does not qualify as an Incentive Stock Option, it is intended to be a Nonstatutory Stock Option.

Notwithstanding the above, if designated as an Incentive Stock Option, in the event that the Shares subject to this Option (and all other Incentive Stock Options granted to Optionee by the Company or any Parent or Subsidiary, including under other plans of the Company) that first become exercisable in any calendar year have an aggregate fair market value (determined for each Share as of the date of grant of the option covering such Share) in excess of $100,000, the Shares in excess of $100,000 shall be treated as subject to a Nonstatutory Stock Option, in accordance with Section 5(c) of the Plan.

3.     **Exercise of Option.**   This Option shall be exercisable during its term in accordance with the Vesting/Exercise Schedule set out in the Notice and with the provisions of Section 10 of the Plan as follows:

(a)     **<u>Right to Exercise.</u>**

(i)     This Option may not be exercised for a fraction of a share.

(ii)     In the event of Optionee's death, Disability or other termination of Continuous Service Status, the exercisability of this Option is governed by Section 5 below, subject to the limitations contained in this Section 3.

(iii)     In no event may this Option be exercised after the Expiration Date set forth in the Notice.

(b)     **<u>Method of Exercise.</u>**

(i)     This Option shall be exercisable by execution and delivery of the Exercise Agreement attached hereto as <u>Exhibit A</u> or of any other form of written notice approved for such purpose by the Company which shall state Optionee's election to exercise this Option, the number of Shares in respect of which this Option is being exercised, and such other representations and agreements as to the holder's investment intent with respect to such Shares as may be required

CONFIDENTIAL

by the Company pursuant to the provisions of the Plan.  Such written notice shall be signed by Optionee and shall be delivered to the Company by such means as are determined by the Plan Administrator in its discretion to constitute adequate delivery.  The written notice shall be accompanied by payment of the aggregate Exercise Price for the purchased Shares.

        (ii)     As a condition to the exercise of this Option and as further set forth in Section 8 of the Plan, Optionee agrees to make adequate provision for federal, state or other tax withholding obligations, if any, which arise upon the grant, vesting or exercise of this Option, or disposition of Shares, whether by withholding, direct payment to the Company, or otherwise.

        (iii)     The Company is not obligated, and will have no liability for failure, to issue or deliver any Shares upon exercise of this Option unless such issuance or delivery would comply with the Applicable Laws, with such compliance determined by the Company in consultation with its legal counsel.  This Option may not be exercised until such time as the Plan has been approved by the holders of capital stock of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such Shares would constitute a violation of any Applicable Laws, including any applicable U.S. federal or state securities laws or any other law or regulation, including any rule under Part 221 of Title 12 of the Code of Federal Regulations as promulgated by the Federal Reserve Board.  As a condition to the exercise of this Option, the Company may require Optionee to make any representation and warranty to the Company as may be required by the Applicable Laws.  Assuming such compliance, for income tax purposes the Shares shall be considered transferred to Optionee on the date on which this Option is exercised with respect to such Shares.

        (iv)     Subject to compliance with Applicable Laws, this Option shall be deemed to be exercised upon receipt by the Company of the appropriate written notice of exercise accompanied by the Exercise Price and the satisfaction of any applicable withholding obligations.

    4.    **Method of Payment.**  Payment of the Exercise Price shall be by any of the following, or a combination of the following, at the election of Optionee:

        (a)     cash or check;

        (b)     cancellation of indebtedness;

        (c)     at the discretion of the Plan Administrator on a case by case basis, by surrender of other shares of Common Stock of the Company (either directly or by stock attestation) that Optionee previously acquired and that have an aggregate Fair Market Value on the date of surrender equal to the aggregate Exercise Price of the Shares as to which this Option is being exercised;

        (d)     by participating in a formal cashless exercise program implemented by the Plan Administrator in connection with the Plan;

        (e)     provided that a public market for the Common Stock exists, subject to compliance with applicable law, by exercising as set forth below, through a "same day sale" commitment from Optionee and a broker-dealer whereby Optionee irrevocably elects to exercise this Option and to sell a portion of the Shares so purchased sufficient to pay the total Exercise

2

Price, and whereby the broker-dealer irrevocably commits upon receipt of such Shares to forward the total Exercise Price directly to the Company; or

(f)     by any combination of the foregoing or any other method of payment approved by the Plan Administrator that constitutes legal consideration for the issuance of Shares.

5.     **Termination of Relationship.**  Following the date of termination of Optionee's Continuous Service Status for any reason (the "Termination Date"), Optionee may exercise this Option only as set forth in the Notice and this Section 5.  If Optionee does not exercise this Option within the Termination Period set forth in the Notice or the termination periods set forth below, this Option shall terminate in its entirety.  In no event, may any Option be exercised after the Expiration Date of this Option as set forth in the Notice.  Notwithstanding any provision in the Plan or this Agreement to the contrary, on or after Optionee's Termination Date, this Option may not be exercised with respect to any Shares that are Unvested Shares as determined pursuant to the Vesting/Exercise Schedule set forth in the Notice on Optionee's Termination Date.

(a)     **Termination.**  In the event of termination of Optionee's Continuous Service Status other than as a result of Optionee's Disability or death or for Cause, Optionee may, to the extent Optionee is vested in the Option Shares, exercise this Option during the Termination Period set forth in the Notice.

(b)     **Other Terminations.**  In connection with any termination other than a termination covered by Section 5(a), Optionee may exercise this Option only as described below:

(i)     **Termination upon Disability of Optionee.**  In the event of termination of Optionee's Continuous Service Status as a result of Optionee's Disability, Optionee may, but only within six (6) months following the Termination Date, exercise this Option to the extent Optionee is vested in the Option Shares.

(ii)     **Death of Optionee.**  In the event of termination of Optionee's Continuous Service Status as a result of Optionee's death, or in the event of Optionee's death within thirty (30) days following Optionee's Termination Date, this Option may be exercised at any time within twelve (12) months following the date of death (or, if earlier, the date Optionee's Continuous Service Status terminated) by Optionee's estate or by a person who acquired the right to exercise this Option by bequest or inheritance, but only to the extent Optionee is vested in this Option.

(iii)     **Termination for Cause.**  In the event of termination of Optionee's Continuous Service Status for Cause, this Option (including any vested portion thereof) shall immediately terminate in its entirety upon first notification to Optionee of such termination for Cause.  If Optionee's Continuous Service Status is suspended pending an investigation of whether Optionee's Continuous Service Status will be terminated for Cause, all Optionee's rights under this Option, including the right to exercise this Option, shall be suspended during the investigation period.

6.     **Non-Transferability of Option.**  This Option may not be transferred in any manner other than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by him or her.  The terms of this Option shall be binding upon the executors, administrators, heirs, successors and assigns of Optionee.

3

UBER_000137

7. **Lock-Up Agreement.** In connection with the initial public offering of the Company's securities and upon request of the Company or the underwriters managing any underwritten offering of the Company's securities, Optionee hereby agrees not to sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however and whenever acquired (other than those included in the registration) without the prior written consent of the Company or such underwriters, as the case may be, for such period of time (not to exceed 180 days) from the effective date of such registration as may be requested by the Company or such managing underwriters and to execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of the public offering; provided, however, that, if during the last 17 days of the restricted period the Company issues an earnings release or material news or a material event relating to the Company occurs, or prior to the expiration of the restricted period the Company announces that it will release earnings results during the 16-day period beginning on the last day of the restricted period, then, upon the request of the managing underwriter, to the extent required by any FINRA rules, the restrictions imposed by this subsection (a) shall continue to apply until the end of the third trading day following the expiration of the 15-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event. In no event will the restricted period extend beyond 216 days after the effective date of the registration statement.

8. **Effect of Agreement.** Optionee acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof (and has had an opportunity to consult counsel regarding the Option terms), and hereby accepts this Option and agrees to be bound by its contractual terms as set forth herein and in the Plan. Optionee hereby agrees to accept as binding, conclusive and final all decisions and interpretations of the Plan Administrator regarding any questions relating to this Option. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of the Notice and this Agreement, the Plan terms and provisions shall prevail.

9. **Miscellaneous.**

(a) **Governing Law.** This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of California, without giving effect to principles of conflicts of law.

(b) **Entire Agreement; Enforcement of Rights.** This Agreement, together with the Notice of Stock Option Grant to which this Agreement is attached, the Exercise Agreement and the Plan, sets forth the entire agreement and understanding of the parties relating to the subject matter herein and therein and merges all prior discussions between the parties. Except as contemplated under the Plan, no modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. The failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of any rights of such party.

(c) **Severability.** If one or more provisions of this Agreement are held to be unenforceable under Applicable Laws, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of

CONFIDENTIAL

UBER_000138

this Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of this Agreement shall be enforceable in accordance with its terms.

       (d)    **Notices.**  Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient when delivered personally or at time of transmission if sent by telegram or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, or at the time an electronic confirmation of receipt is received if delivery is by email, and addressed to the party to be notified at such party's address as set forth below or as subsequently modified by written notice.  Any notice for delivery outside the United States will be sent by email, facsimile or by express courier.

       (e)    **Counterparts.**  This Option may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

       (f)    **Successors and Assigns.**  The rights and benefits of this Agreement shall inure to the benefit of, and be enforceable by the Company's successors and assigns.  The rights and obligations of Optionee under this Agreement may not be assigned without the prior written consent of the Company.

*[Signature Page Follows]*

5

CONFIDENTIAL

UBER_000139

IN WITNESS WHEREOF, the parties have executed or, in the case of the Company, caused this Agreement to be executed by its officers thereunto duly authorized, effective as of the Date of Grant set forth in the accompanying Notice of Stock Option Grant.

**THE COMPANY:**

**UBER TECHNOLOGIES, INC.**

By: _____
    (signature)

Name:  Travis Kalanick
Title:   CEO

**OPTIONEE:**

**Lenza McElrath**

_____
(signature)

6

UBER_000140

## EXHIBIT A

## UBER TECHNOLOGIES, INC.

## 2013 EQUITY INCENTIVE PLAN

## EXERCISE AGREEMENT

This Exercise Agreement (this "Agreement") is made as of _____, by and between Uber Technologies, Inc., a Delaware corporation (the "Company"), and Lenza McElrath ("Purchaser").  To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Company's 2013 Equity Incentive Plan (the "Plan").

1.    **Exercise of Option.**  Subject to the terms and conditions hereof, Purchaser hereby elects to exercise his or her option to purchase _____ shares of the Class A Common Stock (the "Shares") of the Company under and pursuant to the Plan and the Stock Option Agreement granted _____ (the "Option Agreement").  The purchase price for the Shares shall be $_____ per Share for a total purchase price of $_____.  The term "Shares" refers to the purchased Shares and all securities received as stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

2.    **Time and Place of Exercise.**  The purchase and sale of the Shares under this Agreement shall occur at the principal office of the Company simultaneously with the execution and delivery of this Agreement, the payment of the aggregate exercise price by any method listed in Section 4 of the Option Agreement, and the satisfaction of any applicable tax withholding obligations, all in accordance with the provisions of Section 3(b) of the Option Agreement.  The Company shall issue the Shares to Purchaser by entering such Shares in Purchaser's name as of such date in the books and records of the Company or, if applicable, a duly authorized transfer agent of the Company, against payment of the exercise price therefor by Purchaser.

3.    **Restrictions and Limitations on Transfer.**  In addition to any other limitation on transfer created by applicable securities laws, Purchaser shall not assign, encumber or dispose of any interest in the Shares except in compliance with the provisions below and applicable securities laws.

(a)    The holder of any security of the Company (a "*Security Holder*"), including Purchaser, shall not, directly or indirectly, transfer, assign, pledge, encumber, hypothecate or otherwise dispose of or encumber (including any conveyance of any economic or pecuniary interest in) any security of the Company (a "*Security*"), other than by means of a Permitted Transfer (as defined below), without the prior written consent of the Board (or an authorized committee of the Board), which consent may be withheld in its sole discretion.  If any provision(s) of any agreement(s) currently in effect by and between the Company and any Security Holder (the "*Security Holder Agreement(s)*") conflicts with Section 8.12 of the Company's bylaws, Section 8.12 shall govern, and the non-conflicting remainder of the Security Holder Agreement(s) shall continue in full force and effect; provided that Section 3(b) shall be deemed not to conflict with Section 8.12 of the Company's bylaws.

UBER_000141

**(b)** For purposes of the transfer restrictions set forth herein, a "*Security*" shall be deemed to be "*Transferred*" in (a) any sale, assignment, transfer, conveyance, hypothecation or other transfer or disposition of a share of any security of the Company or any legal or beneficial interest in such security, whether or not for value and whether voluntary or involuntary or by operation of law, including, without limitation, a transfer of a share of any security to a broker or other nominee (regardless of whether there is a corresponding change in beneficial ownership), or the transfer of, or entering into a binding agreement with respect to, voting control over such security by proxy or otherwise, (b) any hedging or other transaction which is designed to or which reasonably could be expected to lead to or result in a sale or disposition of any security of the Company, even if any security of the Company would be disposed of by someone other than the Security Holder, (c) any transaction involving any short sale or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any security of the Company or with respect to any security that includes, relates to, or derives any significant part of its value from any security of the Company, or (d) any other transaction by Purchaser related to or affecting the ownership, possession or other rights (voting, economic or otherwise) of a security that the Board, in good faith, deems Transferred.

**(c)** A "*Permitted Transfer*" as used in this Section 3 shall be defined as:

(i) any repurchase of a Security by the Company: (i) at cost, upon the occurrence of certain events, such as the termination of employment or services; or (ii) at any price pursuant to the Company's exercise of a right of first refusal to repurchase such shares;

(ii) the transfer of any or all of the Securities held by a Security Holder to a single trust for the benefit of the Security Holder or the Security Holder's Immediate Family;

(iii) any transfer effected pursuant to the Security Holder's will or the laws of intestate succession;

(iv) if the Security Holder is a partnership, limited liability company or a corporation, no more than five (5) transfers to an Affiliate (as defined below) of such partnership, limited liability company or corporation; and/or

(v) the transfer by a Major Investor (as defined in the Amended and Restated Right of First Refusal and Co-Sale Agreement dated August 1, 2013, as amended from time to time, or any successor agreement (the "*Co-Sale Agreement*")) exercising such Major Investor's Co-Sale Right (as defined in the Co-Sale Agreement).

**(d)** In the case of any transfer consented to by the Company or described in subsection (c) above, the transferee, assignee, or other recipient shall receive and hold the Securities subject to the provisions of this Section 3, and there shall be no further transfer of such stock except in accordance with this Section 3.

**(e)** The restrictions in this Section 3 shall terminate upon the earlier to occur of (i) the closing of a Liquidation Transaction (as such term is defined in the Company's Restated Certificate of Incorporation, as amended or restated from time to time) (a "*Liquidation Transaction*") or (ii) immediately prior to an initial public offering under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "*Securities Act*")

2

UBER_000142

pursuant to which all outstanding shares of the Company's preferred stock convert to common stock (an "***IPO***").  Upon termination of such restrictions, a new certificate or certificates representing the outstanding Shares shall be issued, on request, without the legend referred to in subsection 8(a)(iv) below and delivered to Purchaser.

      **(f)**     Purchaser shall comply with the Company's insider trading policy and code of conduct (or related policies) as may be adopted or amended from time to time by the Board (the "***Policies***").  To the extent Purchaser is not an employee of the Company, Purchaser shall comply with the Policies in the same manner as-if Purchaser were deemed an employee of the Company as defined in the Policies.

    4.     **Right of First Refusal.**

      **(a)**     **Right of First Refusal.**  Subject to the limitations set forth in Section 3 above, before any Shares held by Purchaser or any transferee of Purchaser (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section 4(a) (the "Right of First Refusal").

      (i)     **Notice of Proposed Transfer.**  The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating:  (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed purchaser or other transferee ("Proposed Transferee"); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the terms and conditions of each proposed sale or transfer.  The Holder shall offer the Shares at the same price (the "Purchase Price") and upon the same terms (or terms as similar as reasonably possible) to the Company or its assignee(s).

      (ii)     **Exercise of Right of First Refusal.**  At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the Purchase Price.  If the Purchase Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board in good faith.

      (iii)     **Payment.**  Payment of the Purchase Price shall be made, at the election of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness, or by any combination thereof within sixty (60) days after receipt of the Notice or in the manner and at the times set forth in the Notice.

      (iv)     **Holder's Right to Transfer.**  If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section 4(a), then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Purchase Price or at a higher price, provided that such sale or other transfer is consummated within one hundred twenty (120) days after the date of the Notice and provided further that any such sale or other transfer is effected in accordance with any applicable securities laws and the Proposed Transferee agrees in writing that the provisions of Section 3 and this Section 4 shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more

CONFIDENTIAL

UBER_000143

favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(v) **Exception for Certain Family Transfers.** Anything to the contrary contained in this Section 4(a) notwithstanding, and provided that such transfer complies with Section 3 and applicable securities laws, the transfer of any or all of the Shares during Purchaser's lifetime or on Purchaser's death by will or intestacy to Purchaser's Immediate Family or a single trust for the benefit of the Purchaser or the Purchaser's Immediate Family shall be exempt from the provisions of this Section 4(a).

(b) **Company's Right to Purchase upon Involuntary Transfer.** In the event of any transfer by operation of law or other involuntary transfer (including death or divorce, but excluding a transfer to Immediate Family as set forth in Section 4(a)(v) above) of all or a portion of the Shares by the record holder thereof, the Company shall have an option to purchase all of the Shares transferred at the greater of the purchase price paid by Purchaser pursuant to this Agreement or the Fair Market Value of the Shares on the date of transfer (as determined by the Board). Upon such a transfer, the person acquiring the Shares shall promptly notify the Secretary of the Company of such transfer. The right to purchase such Shares shall be provided to the Company for a period of thirty (30) days following receipt by the Company of written notice by the person acquiring the Shares.

(c) **Assignment.** The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any holder or holders of capital stock of the Company or other persons or organizations.

(d) **Restrictions Binding on Transferees.** All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the provisions of this Agreement. Any sale or transfer of the Company's Shares shall be void unless the provisions of this Agreement are satisfied.

(e) **Termination of Rights.** The right of first refusal granted the Company by Section 4(a) above and the option to repurchase the Shares in the event of an involuntary transfer granted the Company by Section 4(b) above shall terminate upon the earlier to occur of (i) the closing of a Liquidation Transaction or (ii) immediately prior to an IPO. Upon termination of the right of first refusal described in Section 4(a) above pursuant to this paragraph (e), the Company will remove any stop-transfer notices referred to in Section 8(b) below and related to the restrictions in this Section 4 and, if certificates are issued, a new certificate or certificates representing the Shares not repurchased shall be issued, on request, without the legend referred to in Section 8(a)(ii) below and delivered to Purchaser.

5. **Investment and Taxation Representations.** In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a) Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing these securities for investment for his or her own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable

4

UBER_000144

provision of state law.  Purchaser does not have any present intention to transfer the Shares to any person or entity.

(b)　　Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c)　　Purchaser further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.  Purchaser further acknowledges and understands that the Company is under no obligation to register the securities.  Purchaser understands that the transfer of the securities is prohibited unless they are registered or such registration is not required in the opinion of counsel for the Company, which opinion is in a form satisfactory to the Company, and that the certificate(s) evidencing the securities will be imprinted with a legend providing for the foregoing.

(d)　　Purchaser is familiar with the provisions of Rules 144 and 701, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Purchaser understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144 or Rule 701, which rules require, among other things, that the Company be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions. Notwithstanding this paragraph (d), Purchaser acknowledges and agrees to the restrictions set forth in paragraph (e) below.

(e)　　Purchaser further understands that in the event all of the applicable requirements of Rule 144 or 701 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 or 701 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(f)　　Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares.  Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

(g)　　Purchaser hereby acknowledges that Purchaser has been informed that, unless an election is filed by the Purchaser with the Internal Revenue Service (and, if necessary, the proper state taxing authorities), **within 30 days of the purchase** of the Unvested Shares, electing pursuant to Section 83(b) of the Code (and similar state tax provisions, if applicable) to be taxed currently on any difference between the purchase price of the Unvested Shares and their

5

Fair Market Value on the date of purchase, there may be a recognition of taxable income (including, where applicable, alternative minimum taxable income) to the Purchaser, measured by the excess, if any, of the Fair Market Value of the Unvested Shares at the time they cease to be Unvested Shares, over the purchase price of the Unvested Shares.  A form of Election under Section 83(b) is attached hereto as <u>Attachment 1</u> for reference.  PURCHASER HEREBY ASSUMES ALL RESPONSIBILITY FOR FILING SUCH ELECTION AND PAYING ANY TAXES RESULTING FROM SUCH ELECTION OR THE LAPSE OF THE REPURCHASE RESTRICTIONS ON THE UNITED STATES.

6.  **Company's Repurchase Option**.  The Company, or its assignee, shall have the option to repurchase all or a portion of the Unvested Shares (as such term is defined in the Notice of Stock Option Grant for the Option Agreement) on the terms and conditions set forth in this Section (the "<u>Repurchase Option</u>") if Purchaser should cease to be employed by the Company for any reason, or no reason, including, without limitation, Purchaser's death, Disability, voluntary resignation or termination by the Company with or without cause.

(a)  <u>Right of Termination Unaffected</u>.  Nothing in this Agreement shall be construed to limit or otherwise affect in any manner whatsoever the right or power of the Company to terminate Purchaser's employment at any time, for any reason or no reason, with or without cause.  For purposes of this Agreement, Purchaser shall be considered to be employed by the Company if Purchaser is an officer, director or full-time employee of the Company or any Parent, Subsidiary or Affiliate of the Company or if the Board of Directors of the Company determines that Purchaser is rendering substantial services as a part-time employee, consultant, contractor or advisor to the Company or any Parent, Subsidiary or Affiliate of the Company.  The Committee of the Company shall have discretion to determine whether Purchaser has ceased to be employed by the Company or any Parent, Subsidiary or Affiliate of the Company, whether termination is for Cause, and the date of such termination (the "<u>Termination Date</u>"), and such determination shall be binding on Purchaser.

(b)  <u>Exercise of Repurchase Option</u>.  At any time within 90 days after the later of the Termination Date and the date Purchaser purchased the Shares, the Company, or its assignee, may elect to repurchase all or a portion of the Unvested Shares by giving Purchaser written notice of exercise of the Repurchase Option.

(c)  <u>Calculation of Repurchase Price</u>.  The Company or its assignee shall have the option to repurchase from Purchaser (or from Purchaser's personal representative as the case may be) all or a portion of the Unvested Shares at the purchase price per Share paid by the Purchaser as provided in Section 1 hereof.

(d)  <u>Payment of Repurchase Price</u>.  The repurchase price shall be payable, at the option of the Company or its assignee, by check or by cancellation of all or a portion of any outstanding indebtedness of Purchaser to the Company or such assignee, or by any combination thereof.  The repurchase price shall be paid without interest within 30 days after exercise of the Repurchase Option.

7.  **Escrow of Unvested Shares.**  For purposes of facilitating the enforcement of the provisions of Section 3 and 6 above, Purchaser agrees, immediately upon receipt of the certificate(s) for the Shares subject to the Repurchase Option, to deliver such certificate(s), together with an Assignment Separate from Certificate in the form attached to this Agreement as

6

Attachment A executed by Purchaser and by Purchaser's spouse (if required for transfer), in blank, to the Secretary of the Company, or the Secretary's designee, to hold such certificate(s) and Assignment Separate from Certificate in escrow and to take all such actions and to effectuate all such transfers and/or releases as are in accordance with the terms of this Agreement. Purchaser hereby acknowledges that the Secretary of the Company, or the Secretary's designee, is so appointed as the escrow holder with the foregoing authorities as a material inducement to make this Agreement and that said appointment is coupled with an interest and is accordingly irrevocable. Purchaser agrees that said escrow holder shall not be liable to any party hereof (or to any other party). The escrow holder may rely upon any letter, notice or other document executed by any signature purported to be genuine and may resign at any time. Purchaser agrees that if the Secretary of the Company, or the Secretary's designee, resigns as escrow holder for any or no reason, the Board shall have the power to appoint a successor to serve as escrow holder pursuant to the terms of this Agreement.

8.   **Restrictive Legends and Stop-Transfer Orders.**

(a)   **Legends.**   The certificate or certificates representing the Shares shall bear the following legends (as well as any legends required by applicable state and federal corporate and securities laws):

(i)   THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL FOR THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

(ii)   THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE HOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

(iii)   THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON PUBLIC RESALE AND TRANSFER, INCLUDING THE RIGHT OF REPURCHASE AND RIGHT OF FIRST REFUSAL HELD BY THE ISSUER AND/OR ITS ASSIGNEE(S), AND A MARKET STANDOFF AGREEMENT AS SET FORTH IN A STOCK OPTION EXERCISE AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH PUBLIC SALE AND TRANSFER RESTRICTIONS INCLUDING THE RIGHT OF REPURCHASE, RIGHT OF FIRST REFUSAL AND THE MARKET STANDOFF ARE BINDING ON TRANSFEREES OF THESE SHARES.

CONFIDENTIAL

UBER_000147

(iv)    THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER CONTAINED IN THE BYLAWS OF THE COMPANY.

(b)    **Stop-Transfer Notices.**    Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)    **Refusal to Transfer.**  The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

9.    **No Employment Rights.**  Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent or subsidiary of the Company, to terminate Purchaser's employment or consulting relationship, for any reason, with or without cause.

10.    **Lock-Up Agreement.**    In connection with the initial public offering of the Company's securities and upon request of the Company or the underwriters managing any underwritten offering of the Company's securities, Purchaser agrees not to sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (other than those included in the registration) without the prior written consent of the Company or such underwriters, as the case may be, for such period of time (not to exceed one hundred eighty (180) days) from the effective date of such registration as may be requested by the Company or such managing underwriters and to execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of the public offering; provided however that, if during the last 17 days of the restricted period the Company issues an earnings release or material news or a material event relating to the Company occurs, or prior to the expiration of the restricted period the Company announces that it will release earnings results during the 16-day period beginning on the last day of the restricted period, then, upon the request of the managing underwriter, to the extent required by any FINRA rules, the restrictions imposed by this Section 10 shall continue to apply until the end of the third trading day following the expiration of the 15-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event.  In no event will the restricted period extend beyond 216 days after the effective date of the registration statement.

11.    **Miscellaneous.**

(a)    **Governing Law.**  This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of California, without giving effect to principles of conflicts of law.

(b)    **Entire Agreement; Enforcement of Rights.**  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them.  No modification of or amendment to this Agreement,

8

UBER_000148

nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement.  The failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of any rights of such party.

(c) **Severability.**  If one or more provisions of this Agreement are held to be unenforceable under Applicable Laws, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(d) **Notices.**  Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient when delivered personally or at time of transmission if sent by telegram or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, or at the time an electronic confirmation of receipt is received if delivery is by email, and addressed to the party to be notified at such party's address as set forth below or as subsequently modified by written notice.

(e) **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

(f) **Successors and Assigns.**  The rights and benefits of this Agreement shall inure to the benefit of, and be enforceable by the Company's successors and assigns.  The rights and obligations of Purchaser under this Agreement may only be assigned with the prior written consent of the Company.

(g) **California Corporate Securities Law.**  THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE.  THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

*[Signature Page Follows]*

CONFIDENTIAL                                                                                    UBER_000149

The parties have executed this Exercise Agreement as of the date first set forth above.

**THE COMPANY:**

**UBER TECHNOLOGIES, INC.**

By: _____
      (signature)

Name:

Title:

Address:

**OPTIONEE:**

**Lenza McElrath**

_____
(signature)

I, _____, spouse of Lenza McElrath, have read and hereby approve the foregoing Agreement. In consideration of the Company's granting my spouse the right to purchase the Shares as set forth in the Agreement, I hereby agree to be irrevocably bound by the Agreement and further agree that any community property or other such interest shall hereby by similarly bound by the Agreement. I hereby appoint my spouse as my attorney-in-fact with respect to any amendment or exercise of any rights under the Agreement.

_____
Spouse of Lenza McElrath (if applicable)

10

CONFIDENTIAL

UBER_000150

## ATTACHMENT 1

## SECTION 83(b) ELECTION

CONFIDENTIAL

## ELECTION UNDER SECTION 83(b) OF THE INTERNAL REVENUE CODE

The undersigned Taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended, to include the excess, if any, of the fair market value of the property described below at the time of transfer over the amount paid for such property, as compensation for services in the calculation of: (1) regular gross income; (2) alternative minimum taxable income; or (3) disqualifying disposition gross income, as the case may be.

1.    TAXPAYER'S NAME: _____

        TAXPAYER'S ADDRESS: _____

        _____

        SOCIAL SECURITY NUMBER: _____

2.    The property with respect to which the election is made is described as follows: _____ shares of Class A Common Stock of **UBER TECHNOLOGIES, INC.**, a Delaware corporation (the "**Company**") which were transferred upon exercise of an option by Company, which is Taxpayer's employer or the corporation for whom the Taxpayer performs services.

3.    The date on which the shares were transferred pursuant to the exercise of the option was _____, \_\_\_\_\_ and this election is made for calendar year \_\_\_\_\_.

4.    The shares received upon exercise of the option are subject to the following restrictions:  The Company may repurchase all or a portion of the shares at Taxpayer's original purchase price per share, under certain conditions at the time of Taxpayer's termination of employment or services.

5.    The fair market value of the shares (without regard to restrictions other than restrictions which by their terms will never lapse) was $\_\_\_\_\_ per share x _____ shares = $_____ at the time of exercise of the option.

6.    The amount paid for such shares upon exercise of the option was $\_\_\_\_ per share x _____ shares = $_____.

7.    The Taxpayer has submitted a copy of this statement to the Company.

8.    The amount to include in gross income is $_____. [The result of the amount reported in Item 5 minus the amount reported in Item 6.]

*THIS ELECTION MUST BE FILED WITH THE INTERNAL REVENUE SERVICE ("**IRS**"), AT THE OFFICE WHERE THE TAXPAYER FILES ANNUAL INCOME TAX RETURNS, <u>WITHIN 30 DAYS</u> AFTER THE DATE OF TRANSFER OF THE SHARES, AND MUST ALSO BE FILED WITH THE TAXPAYER'S INCOME TAX RETURNS FOR THE CALENDAR YEAR.  THE ELECTION CANNOT BE REVOKED WITHOUT THE CONSENT OF THE IRS.*

Dated: _____

                                    Lenza McElrath

UBER_000152

## ATTACHMENT A

## STOCK POWER AND ASSIGNMENT
## SEPARATE FROM STOCK CERTIFICATE

CONFIDENTIAL

## STOCK POWER AND ASSIGNMENT
## SEPARATE FROM STOCK CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Stock Option Exercise Agreement dated as of _____, _____, (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto ,_____ (_____) shares of the Class A Common Stock $0.00001 par value per share, of Uber Technologies, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____, _____

**PURCHASER**

_____
(Signature)

_____
(Please Print Name)

_____
(Spouse's Signature, if any)

_____
(Please Print Spouse's Name)

**Instructions to Purchaser:  Please do not fill in any blanks other than the signature line**.  The purpose of this Stock Power and Assignment is to enable the Company to acquire the shares and to exercise its "Refusal Right" or "Repurchase Option" set forth in the Agreement without requiring additional signatures on the part of the Purchaser or Purchaser's Spouse, if any.

UBER_000154